Good morning, and may it please the Court. My name is Mark Victor. I'm with the law firm of Victor at Hall in Mesa, Arizona, and I'm here representing the appellant Miss Sandra Brown. Members of the panel, I'm asking you today to reverse both of her convictions for insufficient evidence. I think that there's no doubt that my client is certainly a marijuana dealer, marijuana user. She was dating what I would call sort of a big-time marijuana dealer, certainly a member of a conspiracy. This is Mr. Navarette, you may recall. I don't think there's any question about any of that. Additionally, I think she rather innocently introduced her boyfriend, Mr. Navarette, to a longstanding friend of hers, Mr. Brodbeck. Counsel, on the conspiracy count, just speaking only for myself, it seems to me that there's plenty of evidence from which a rational jury could conclude that she was part of the conspiracy and that she was guilty on the first count. They didn't have to believe that she just innocently introduced, et cetera. That's an awful lot of coincidences that the jury wasn't required to believe. And I think that in what I'd appreciate from you is why you think the conspiracy evidence was insufficient when that evidence is viewed in the light most favorable to the verdict. Okay. Your Honor, here's why I think that. I think that the government alleged an awful lot of facts that I would refer to maybe as sort of so what facts, things that even when added together don't amount to the kind of knowledge sufficient to further a conspiracy. And just very briefly, these are facts taken from actually the government's brief at page 12 and 13, things like my client being privy to insider information about the organization. I think even if she was privy to that kind of information, that sort of comes under the mere knowledge argument, the line of cases that say knowledge is not enough. Also things like she knew the location of their homes, she got to view some of the merchandise. We don't we certainly don't dispute that she was purchasing marijuana from one of the members of the conspiracy. Well, counsel, what I got from your brief and what I'm getting from your argument also is that if you take each of the facts that was proved, you could find a possible innocent explanation for it. But that isn't the test, is it? Isn't it whether a jury could have found the opposite of the innocent explanation? I mean, you seem to still be approaching it as we have to look at the evidence in your favor. But at this point, we don't. I'm sorry that appears I'm approaching things. I'm not. I am fully aware that we need to defer every inference goes to the government at this stage. Let me say it like this, Your Honor. When you read through the government's brief, I think that you're sort of left with, wow, this is an overwhelming case of conspiracy. And if what the government alleged in the government's brief was correct, I think that I wouldn't be here arguing conspiracy. I think that what happened here ---- What in the brief is a fact alleged that isn't supported by the record? I have come up with nine things that I think you can go through the brief rather carefully, and I'll get to those right now. First, the government's brief at page six where they allege that my client bought and sold marijuana for the organization. Well, if you go to the excerpt of record that is relied upon for that assertion, it's just simply not there. And I would urge the panel respectfully to just take a look at some of the things that the government relies on for these assertions, because if they're true, I'll admit I'm done. I lose on the conspiracy count. Second thing, my client personally vouched for Mr. Brodbeck's trustworthiness. This is the government's brief at page 12. There is a discussion of vouching, and it's a discussion really that the prosecutor brought out. It was the prosecutor who talked about vouching. But if you look at the witness, the witness isn't so sure that that was the case. The witness actually says he doesn't remember, never actually agrees with the prosecutor on this point. There are other things. My third point that my client, and this is alleged in the government's brief at page 12, my client inquired about the trustworthiness of Mr. Gleeson, who was a pilot for the organization. Nothing else. Doesn't that raise the question, how did she get there to the plane? It was certainly not in her town, not in her home. She traveled there to meet that plane in Kentucky. Why did she do that? Actually, Your Honor, I think there's some good evidence in the transcript about that. She asked another person for a ride to Arizona from where she was. The other person, who was a member of the conspiracy office, said, no, I can't take you that far. What I'll do is I'll take you to this Paducah, Kentucky place. And there was no discussion ahead of time with the pilot in Kentucky about this. She shows up and says, hey, I'm here. Can I hitch a ride with you? All right. Let's take that as being the fact. And why did she continue to call them along the way and get them where they were? Because they were concerned about the pilot not being trustworthy. So she was the person writing, if I can use the term out here in the West, of a shotgun to make sure that he got to where he was going. Your Honor, I understand the Court's concern, and it is a valid concern. If it was true, if it was supported by the testimony, I think I'm not here. But I think if you take that portion of the government's transcript and you go back to the excerpts of records and you look at it, it's just simply not in there. I think in the terms that I was just looking for this, in terms of Brodbeck's testimony, he testifies twice that I'm finding as I flip back though it that the defendant vouched for his trustworthiness. The question, do you recall if the defendant at that meeting had anything to say about you becoming a pilot for the organization, not specifically but in generality, that I was okay, that I'd be trustworthy and could be used in the operation. But he says that at least twice in his testimony. I don't understand why you think that isn't enough. Your Honor, I am not certain where you're referring to. Are you referring to where the government's brief starts at? No, I'm looking at transcript pages. No, I don't have his. I was just reading an excerpt from Mr. Brodbeck's testimony, and I'm looking at page 3. Is it in the appellant's excerpts or would it be the supplemental? Well, you know, I didn't paginate it that way. This may be directly from the record, but I have it. It's around page 400-ish in the record, 437. I guess that's Iger's testimony. I'm sorry. But it's at page 437. And there's something similar from Brodbeck in his testimony. I guess my point being that whether the specific page of the excerpt says what the government says it says, it seemed to me that that testimony, the actual testimony did support what they're saying about it. Well, Your Honor, I think that certainly my client was his longstanding friends with Brodbeck. I'm not ñ I can't really speak to that specific portion of the transcript. I wish I had it in front of me, but I don't. I don't know where it is. I would say this, that I think that there's evidence that my client, there's no question she introduced Navarette to Brodbeck. There's no question that they were friends. She also was transporting some of her goods, I'll say, because I don't think that the transcript is clear, whether she was transporting either money or drugs or jewelry or something. And I think she had some concerns, not about Brodbeck, but I think about some of the other pilots who she didn't know that she left some cash and other items overnight. And so I can't really speak to that portion, but I think the closest that I find is this ñ well, maybe that was the vouching argument. I'm not ñ I'm really not sure which area the Court was referring to, and I apologize for that. But I know there's other allegations regarding some of the other pilots, Mr. Gleason. Wouldn't that be enough to demonstrate participation in the conspiracy if she was vouching for the trustworthiness of pilots who could be used in the operation? You know, Your Honor, I think I'd have to concede. I think if the evidence actually bears that out, then I admit that a slight connection is all that's necessary. I admit that the ambiguous testimonies or reasonable inferences from that testimony are construed in favor of the government. I just think that if you look at the testimony and you look maybe ñ I'm not sure what excerpt you have. Maybe you don't have what's right before it or right after it. But I think if you read it through carefully, and I would just ask the members of the panel to do that, I don't think it's clear that she is indeed having a discussion about benefiting the organization and saying, yes, my position is this person is trustworthy and this person should be used. I don't think she was involved in some of the meetings that the government just sort of says, yes, this ñ and the next thing she did was on behalf of the organization. She did do some things. Like I said, she did sell some marijuana. She did have some customers. And if you read the transcript, there is evidence about that. But it's not evidence that would go sort of on behalf of the organization. And I think that's the part that's just simply not in there. This issue of ñ that Judge Wiener brought up, or Justice Wiener maybe in this setting, this closely coordinating pickups and deliveries of money and marijuana from the organization, I think if you look at Mr. Barraza's testimony, he's not even certain that she knew, my client knew, that there was marijuana on the plane. I just think there's not evidence at all in the record anywhere about her closely coordinating deliveries. But why did she go to Kentucky from your point of view? I think the answer to that is she had to go there to get to Phoenix. That was sort of the place for her. It was the only way. The other pilot couldn't bring her. Where was the plane going to land finally? Well, I don't know where it was final destination. I know it was going to Phoenix from Kentucky. She got sort of one ride from where she was to Kentucky. No, I understand that. But she was sent to Kentucky by somebody. She didn't just go there because she decided Kentucky was a good place to meet that plane. I don't think she had any reason to be in Kentucky other than to meet the plane to get to Phoenix. And then she continued to give them the signals where she was and how the plane was progressing and keep those folks happy that she was watching things. That's the part that I do not believe is in the record. I just simply don't think the record bears that out. And I think if Your Honor goes back to the record and looks at that, you'll find it's just not supported in there at all. I think the record is clear that the money was put on the plane in New York long before. I think it's clear that that money was going to be delivered whether or not my client was on that plane. I think it's clear that my client had no discussion with anyone about that money. And I think that the district judge's concerns in response to the motion for judgment of acquittal, which I think I put in my brief, maybe also in the reply brief, I think were valid. And I think it's just unfortunate that that wasn't ruled on before the jury came back. I think that might have been a difference had that been ruled on. I think if you look at the testimony of each of the members, the members of the conspiracy who testified, Mr. Barraza, for example, was very clear. He said he and his cousin, Mr. Navarrete, were the only members of that conspiracy. They were the only ones that were splitting the profits. There were other people that were employees. They got paid to do things. The pilots got paid to fly. The packaging people got paid to package. My client was neither an employee, didn't get paid. She was simply a person maybe who chose, unfortunately, bad company. She did. No dispute about that. Kennedy. Didn't they give her the priority of buying the best marijuana? I don't know that she got a high grade of marijuana. Wasn't that one of the things she got by being friends with these people? I'll use your term. I don't know that that's the language part. I think the language is in the transcript that she did get to inspect and take a look  But on the other hand, I don't know. In fact, I've never been involved in a marijuana conspiracy, but I would expect that if I was involved, I would want to as a buyer say, hey, let me take a look at the goods or have a sample or something. And the mere fact that they said, okay, you can sort of check out the marijuana before you buy it, I don't think somehow springboards her into being a member of the conspiracy. Counsel, you have about two minutes left if you want to say that. I think I will. Thank you, Your Honor. We'll hear from the government. Good morning. May it please the Court. Linda Boone on behalf of the United States. Ms. Boone, I have as much difficulty with your argument on the money laundering piece as I do with opposing counsel's argument on the conspiracy. Your Honor, I beg your pardon. What is there in this record that supports a financial transaction by this defendant and not by someone else? And not by someone else. Your Honor, this Court has specifically held, reaffirming the reasoning in Montoya and Manorite, that a jury may infer intent to promote illegal activity from evidence that illicit proceeds have been transferred. Now, referring to the testimony at SCR 59 and 60, Mr. Barraza is testifying and he is explaining that there was a lot of money involved, around $250,000. They were worried about it. And Navarette paged the defendant, not the pilots, but the defendant in this case. And that was the weekend of February 11th, 1998. But she didn't do the transferring. Somebody else did the transferring. And isn't opposing counsel correct that that money was going to move whether or not she had hitched a ride on the plane? Your Honor, yes. The money, that came from New York. But the defendant was charged with transferring from Kentucky to Phoenix. And let us not forget that she herself brought on to the plane approximately $50,000 of drug proceeds. Did she transfer that $50,000? Yes, Your Honor. To whom? First, she gave that to Pilot Gleason, who held it overnight. And I won't get into details from that. But you will find at SCR 30C and 103 that she was boasting about the fact that she was bringing $50,000 approximately of cash proceeds from her own deals. But he holds it overnight, and then what happens to it? It goes on to the plane when they leave that day. She was staying in a hotel overnight. But it remains her money, right? The $50,000. Well, no, it wasn't her money, Your Honor. It was proceeds from her sales, which she was transferring to Arizona. She was bringing that money to Navarrete and Grosvenor. Okay. What's the evidence of what happened to it when it reached Phoenix, the $50,000 that she brought with her? The testimony does not establish who met the plane, only that it was some members. Well, does the testimony establish that she transferred that $50,000 to anyone else other than herself? Your Honor, on yes, there is testimony that she said that she was bringing that money. I'm sorry. I want to find it exactly. Let's see. Did you ever find out what the contents of that bag, Ms. Foster, the defendant's Do you have any idea what it contained? This is Mr. Gleeson testifying. I learned that day that it was cash. You're going on to have an understanding. What was the cash for? Answer. To pay for the marijuana. That's it? That's the entirety of what we know about transferring the $50,000? And that we know that it did get to Arizona, Your Honor. It can be intended for that purpose, but if it's not actually transferred, is that money laundering? If it was not transferred, it would not be money laundering, Your Honor. However, the hold, the prior holdings by this Court were that you don't have to even show that the money is actually, that anything actually happens other than transfer. And we do know that the money did reach. That's what I'm asking you. How do we know that the $50,000 reached someone else at the other end besides the defendant picking up her own bag, and how do we know that it went to someone else other than what you just read us, which is I think that's what it was supposed to be for, but it doesn't actually say it happened. Your Honor, I'm sorry. That is all that is directly related to where that money went. Okay. However. I'm sorry. Go ahead. Okay. However, knowing from the testimony that the co-defendants Barraza and Navarette were specifically concerned about this money and that this defendant was keeping tabs for them on the arrival time, when they were going to get there, and that the money actually was received. That's an interesting question, because what that suggests is that she may have aided and abetted the financial transaction that involved the $200,000 or $250,000, the money that would have gone on the plane whether she had been there or not. But she wasn't charged with aiding and abetting. And that wasn't argued below, was it? Aiding and abetting wasn't argued, Your Honor. It was argued that she transferred, assisted transferring. So basically, we have to find that she actually did some transferring herself and didn't just aid and abet somebody else's transfer in order to uphold this conviction. I agree, Your Honor. Okay. And I would submit that the government doesn't have to prove that it was this defendant who actually handed the money to the defendants, the other defendants, the co-defendants. It's not enough to watch. If she had done nothing but be on the plane, let's say she had not made a phone call to say we're on our way, we're sorry we're late. If she had just, if somebody had said I've got $250,000 and I'm going to give it to you, so-and-so, and she wouldn't say, wow, that's a lot of money. Then that would definitely not be enough, Your Honor. Okay. So making the phone call, you think, is enough to make her a transferor instead of an aider and abetter? Yes, Your Honor, because she showed so much concern for the money. We have, in fact, further testimony that because she didn't know Mr. Gleason, and this was very interesting, because the defendant argues that this testimony isn't there, but, in fact, it was defense counsel questioning Mr. Yerger, the pilot, and he asked, and this is at ER-5, page 497, the question is, Mr. Brodbeck became concerned about where the money was because he didn't know Mr. Gleason. Is that fair to say? And Pilot Yerger responds, well, yes, I think that's fair to say. It was both Ms. Foster, that's the defendant, and Brodbeck that expressed concern, because Mr. Gleason, the pilot, had separated from Pilot Yerger, and he had the money that had been brought from New York. So this is before he even got the $50,000. Why is concern money laundering, though, as opposed to aiding and abetting or as opposed to being part of the conspiracy? I guess I just don't understand why the expression of concern is – gets you all the way there when she has to do the transferring under your theory. Your Honor, it was more than concern. That was just part of it. She expressed concern. She kept – attempted to keep tabs on Mr. Gleason and questioned where was this money, where – when were they going to get in, and made every attempt to make sure that that money safely arrived besides her $50,000, which she was boasting about, which was going. But putting to one side her $50,000 and talking rather about the larger sum. Yes. But maybe we can start it in the abstract. What's necessary to move someone from the status of aider and abetter to someone who actually does the transfer? Because I understand the statute requires that the defendant do perform, be a principal with respect to the transfer. And I would say active participation, Your Honor. This defendant did not fly the plane, but she did everything else to help ensure that she – Did she touch the money? Well, I know that she touched only – I can only – Let me say it this way. Did she physically control the larger sum of money? Did she have it in her possession? She never had it in her possession, Your Honor. She did not. The evidence was that Pilot Gleason loaded the plane, and he also believed that he loaded her $50,000 on his plane. So stating the evidence in the way most favorable to you, which is how we need to do it – Yes, Your Honor. She's there on the airplane. Yes, Your Honor. She knows the larger sum of money is there. She's making phone calls, alerting Navarat as to where the plane is and the progress of the airplane. And in your estimation, it's a reasonable inference that can be drawn that she's doing that in order to sort of keep track of or, in your words, keep tabs on these people. Yes, Your Honor. I think that may well be aiding and abetting, but I'm having trouble seeing how that has her doing it as a principle. Can you help me with more evidence that I don't yet have my hands on? Is there something I'm not focused on in terms of what she did? No, Your Honor. That is the extent of the evidence. Okay. And the government can only argue that if we have facts which would support conflicting inferences, then we need to presume that the trier of fact resolved conflicts in favor of the prosecution. But I stated the evidence favorably to you, and I've pretty much given the extent of the evidence favorable to you. Okay. Absolutely. I can't argue anything more. However, as to her participation, the government proved without question three specific meetings that defense counsel submitted that the evidence just wasn't there. On February 16th, 1997, and we find this at ER-5, pages 381 and 384 to 5, Pilate testified that Mr. Brodbeck, at defendant's request, came to Phoenix and had a sit-down meeting with the defendant and Navarrette. And Mr. Brodbeck testified that he was introduced to Navarrette at that meeting, that the subject of the conversation was transporting marijuana, and that Brodbeck was asked to fly marijuana to Nashville, Tennessee, for the defendant. He testified that Navarrette wanted to know, that Navarrette was concerned and, to use Mr. Brodbeck's words, wanted to know who Sandy had thrown herself in with. And Mr. Brodbeck testified that that was his very first meeting, his introduction to Navarrette. That's also at S.E.R. 83. Then, on February the 22nd, he, Brodbeck, the pilot, was taken by Navarrette and the defendant to a trailer house, where Brodbeck testified she picked up 40 pounds of marijuana. He saw it, he smelled it, and she told him it was marijuana, and he flew it to Nashville, Tennessee. We find that at S.E.R. 77 to 81. Next, just three weeks later, on March 15th, 1997, Navarrette calls him directly and asks him to fly marijuana to Omaha, introduces him to an Omaha drug customer. And the next day, he did, in fact, fly marijuana to Omaha. We find that at S.E.R. 82 and E.R. 5386 to 7. These are very specific. There was then the meeting with Pilot Yerger. That was prior to May 22nd, 1997, because Mr. Yerger testified that May 22nd, 1997 was his first flight for the Navarrette group. We find at S.E.R. 92 to 94 that the defendant was included in this meeting with Navarrette, with Pilot Brodbeck, Pilot Yerger, to decide if Yerger could be trusted to fly for the organization. Yerger testified specifically, quote, I was there to meet the people and, as someone has said, to check me out to see if I was okay to be involved with them. Brodbeck brought Yerger to the meeting in Phoenix, and the subject was transporting marijuana. And the defendant expressed her opinion that Yerger was okay, would be trustworthy, and could be used by the organization. We find also at S.E.R. 99 that Yerger ratifies that and says it was his impression that the defendant had a part in okaying him to fly for the organization. And I've already discussed the Gleason meeting, and that was specifically at ER 5, pages 399 and 497, where the question was asked if Mr. Brodbeck was concerned about the money because they didn't know Gleason. And Yerger responded, it was both Ms. Foster and Brodbeck. The government would submit, Your Honor, that the jury was free and did properly make inferences. There was sufficient information here that there was, based on the evidence of the conspirators, that she exercised control over drugs, she exercised control over drug money, and she made decisions over whether pilots could be used for the organization. Therefore, that was sufficient evidence to support her conviction as charged in Count 1. Thank you very much, counsel. I believe you have a little bit of rebuttal time remaining, Mr. Victor. Thank you, Your Honor. Members of the panel, the way that I see this case is you really don't need us. As much as we like to think you need us for things as lawyers, you really don't in this case. We don't – there's really no dispute here on anybody's part about what the law is. We all know what the law is. The issue here is whether there's facts that a reasonable jury could have drawn inferences. And in the time that I have, it's next to impossible for me to sort of take you through each one of these allegations. What I would suggest and humbly request that you do, because it is a very important case for my client, is maybe take the facts as alleged in the government's brief and look to the places in the transcript that the government has given you as support for these statements, these inferences, and decide for yourself if you think that really a reasonable jury could infer the type of things that are being said. There's one – Well, isn't it more correct to say we should just read the transcript and decide, regardless of whether the government thought to cite something, if it's there, it's there, whether they cited it or not. Your Honor, I'm just concerned for your very precious time. Certainly, feel free to read the entire transcript. I think the government has given you the points that are the strongest for the government, and if you read those and it's not there, then maybe there's something here on the conspiracy argument for my – for my side. I will make this point. But you have no objection to our reading the entire transcript? Officially, for the record, Your Honor, no. Spend as much time as you like. Your Honor, but I do want to just clarify one point, and I'm not – I only have 25 seconds, but this issue of being concerned, if you look to Mr. Yorger's testimony and you read it carefully, I think that what she's concerned about is not the $300,000 that's on the plane. She doesn't even know about that, and that's exactly what Mr. Yorger testifies to. What she's concerned about is this briefcase that she has that somebody thinks has cash in it, and it may or may not. But in any event, we concede she was a drug dealer. We know she moved around her own cash. The government takes a liberty there and says that was for the organization. It wasn't for the organization. There's no way a reasonable jury or a reasonable person could really take that from what is said in this transcript. So I've said my piece. Thank you very much. Thank you very much. We appreciate the arguments of both counsel and your – everybody's familiarity with the record. The case just argued is submitted, and for this session we'll stand adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you so much. J. Hancock. Sorry, do you know that was why I couldn't come to let you all know that because it was locked? Yeah. I didn't know mine was locked. Hey, not to worry. We got out. Actually, there's a little button down here. Oh, there is? This is the first time I'm here. There is a button down here. Oh, okay. That's good. Thank you. Thank you. Thank you. Thank you.
judges: Graber, W. Fletcher, Weiner